# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DEBBIE D. JOHNSON** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00071 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By:  GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Debbie D. Johnson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Johnson's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

1

be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Johnson filed her application for DIB on May 30, 2006, alleging disability as of February 28, 2006, due to rheumatic heart disease with left mitral regurgitation, high cholesterol, shortness of breath, sleep apnea, dizziness and headaches. (Record, ("R."), at 46-50, 53, 57, 91.) The claim was denied initially and upon reconsideration. (R. at 38-45.) Johnson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 36-37.) A hearing was held before the ALJ on October 11, 2007, at which Johnson was represented by counsel. (R. at 288-326.)

By decision dated January 15, 2008, the ALJ denied Johnson's claim. (R. at 17-23.) The ALJ found that Johnson met the disability insured status requirements of the Act for disability purposes through December 31, 2011. (R. at 19.) The ALJ determined that Johnson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.) The ALJ also found that Johnson suffered from severe impairments, namely mitral valve insufficiency with sinus tachycardia. (R. at 19.) However, the ALJ determined that Johnson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ also found that Johnson possessed the residual functional capacity to perform a range of light exertional work[1] that allowed her to lift or carry items weighing up to 10

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or

2

pounds frequently and items weighing up to 20 pounds occasionally. (R. at 20). The ALJ found that Johnson was able to stand or walk for six hours out of an eight-hour workday and for one mile at a time and sit for six hours out of an eight-hour workday, but she could not be exposed to fumes and could not work around hazards or hazardous machinery. (R. at 20.) In addition, the ALJ found that Johnson could occasionally climb, balance, stoop, kneel, crouch and crawl, but that she must avoid repetitive lifting, bending and carrying. (R. at 20.) The ALJ determined that Johnson was capable of performing her past relevant work as a general office clerk, as this work did not require the performance of work-related activities precluded by her residual functional capacity. (R. at 23.) Therefore, the ALJ found that Johnson was not under a "disability" as defined under the Act and was not entitled to benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(f) (2009).

After the ALJ issued his decision, Johnson pursued her administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 12-13.) The Appeals Council denied Johnson's request for review, (R. at 5-8), thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009). Thereafter, Johnson filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Johnson's motion for summary judgment, filed May 20, 2009, and on the Commissioner's motion for summary judgment, filed June 22, 2009.

---

carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2009).

## II. Facts

Johnson was born in 1946, which classifies her as a "person of advanced age" under 20 C.F.R. § 404.1563(e).  (R. at 53.)  According to the record, Johnson has a high school education with one year of college instruction and past relevant work experience as an operations administrator.  (R. at 58, 62.)

At Johnson's hearing before the ALJ on October 11, 2007, she testified that, in 1966, she received some vocational training at the Washington County Technical School in clerical skills and typing.  (R. at 291.)  Johnson also noted that she took a few computer classes at Wytheville Community College about 20 years ago.  (R. at 291-92.)  Johnson testified that she was able to read and write, and she indicated that she had a driver's license.  (R. at 293-94.)  Johnson noted that she was an operations administrator and account clerk for Pepsi from 1969 until February 28, 2006, working mainly with computers.  (R. at 294-95.)  Johnson explained that her position required her to enter account numbers into the computer in order to verify that the invoice showed the correct order.  (R. at 296.)  In addition, Johnson testified that she performed inventory checks, which required her walk around and verify that the inventory matched up with production.  (R. at 298.)  With regard to the required walking, Johnson testified that she would first run an inventory check on the computer, and if there was a discrepancy, she would walk over to alert the supervisors.  (R. at 300.)  Johnson admitted that she did not actually do any physical counting of inventory, which would have required crawling up and down ladders.  (R. at 301.)

Johnson stated that she was on her feet for about two-thirds of an average

4

day.  (R. at 301.)  She additionally explained that she stopped working at the Pepsi plant in February 2006 because the company offered her early retirement, which she took due to health concerns.  (R. at 302.)  Johnson stated that her work also required her to lift 50 pounds, which consisted of loading boxes of copy paper onto a dolly for the copier and fax machine.  (R. at 303-04.)  With regard to her health problems, Johnson explained that, after prolonged periods of sitting, her ankles would swell and her feet would hurt, and she experienced a tingling throughout her body.  (R. at  305.)  Additionally, Johnson noted that after prolonged periods of standing, she suffered from shortness of breath and dizziness.   (R. at 305.)  Johnson explained that she did not feel rested in the mornings, but indicated that she did not take any treatment for her sleep apnea.  (R. at 306.)  Johnson noted that she experienced fatigue throughout the day, which affected her activity levels by causing shortness of breath and requiring her to lie down or sit in a recliner with her feet elevated for at least half of the day.  (R. at 306.)  Johnson also noted that she could stand still on her feet for only approximately 10 minutes before experiencing swelling, or for about 30 to 45 minutes if she was walking around.  (R. at 307.)  Johnson explained that she could sit for only about 30 minutes before experiencing swelling in her feet.  (R. at 307.)  She also stated that she could lift and carry items weighing up to 10 pounds, and she also testified that she experienced problems with swelling in her hands.  (R. at 307.)

Johnson testified that her doctor, Dr. Samuel Vernon, M.D., told her that exercise would help remedy her ailments, and Johnson explained that she tried to walk up to one mile in the early mornings.  (R. at 308-09.)  Johnson stated that, when walking, she experienced heavy breathing, causing extreme heart palpitations that required her to stop walking for about two to three minutes before resuming.

5

(R. at 310-11.)  Johnson noted that she had health insurance through Pepsi.  (R. at 311.)  She stated that she continued to experience dizziness two to three times per week upon standing.  (R. at 311.)  Johnson testified that she did not think she could stand six hours during an eight-hour workday, nor did she think she could finish a typical workday without having to lie down.  (R. at 311-12.)

John Newman, a vocational expert, also testified at Johnson's hearing. (R. at 312-26.)  Newman classified Johnson's work as a general office clerk as performed, as medium[2] and semi-skilled.  (R. at 318.)  Newman stated that, in the general economy, this job would typically be performed at the light exertional level and that Johnson would have transferable skills to sedentary[3] occupations, but that there would be more than a little change in terms of tools, work process or work settings.  (R. at 318.)

The ALJ then asked Newman to consider a hypothetical individual of the same age, education and past work experience as Johnson.  (R. at 318.)  In addition, the ALJ asked Newman to assume that the individual was restricted to medium work, noting that such an individual would be able to walk up to only a mile at a time before needing to sit, could occasionally perform postural activities and should not be exposed to fumes or hazardous machines.  (R. at 318-19.)  Newman stated that such an individual would be able to perform Johnson's past

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can do medium work, she also can do light and sedentary work.  *See* 20 C.F.R. § 404.1567(c) (2009).

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  *See* 20 C.F.R. § 404.1567(a) (2009).

relevant work.  (R. at 319.)

The ALJ next asked Newman to limit the same hypothetical individual to light work.  (R. at 319.)  Newman stated that such an individual could perform Johnson's past relevant work as performed in the national economy, noting that work as a general office clerk was classified in the Dictionary of Occupational Titles at the light exertional level.  (R. at 319.)  The ALJ next asked Newman to suppose that the individual needed to avoid repetitive lifting, bending and carrying. (R. at 319.)  Newman stated that such an individual still could perform Johnson's past relevant work as it is performed in the national economy.  (R. at 319.)  The ALJ next asked Newman to suppose that the individual could stand for only about 10 minutes in one place, sit for about 30 minutes at a time and walk for up to one mile at a time, but for no longer than 30 minutes.  (R. at 319-20.)  Newman stated that such an individual could not perform Johnson's past relevant work as it is performed in the national economy.  (R. at 320.)  The ALJ next asked Newman to assume that the individual was unable to stand six to eight hours a day.  (R. at 320.)  Newman stated that such an individual could not perform Johnson's past relevant work as it is performed in the national economy.  (R. at 320.)  Newman stated that Johnson possessed transferable skills at the light or sedentary levels, but that they would require more than a little change in terms of tools, work processes or work settings.  (R. at 320.)

In rendering his decision, the ALJ reviewed records from Wythe County Community Hospital; Cardiovascular Associates, P.C.; Dr. Shirish Shahane, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Samuel Vernon, M.D.; Smyth County Community Hospital; Dr. Robert

7

McGuffin, M.D., a state agency physician; and E. Hugh Tenison, Ph.D., a state agency psychologist. Johnson's attorney also submitted additional treatment notes from Smyth County Community Hospital and Dr. Vernon dated January 24, 2008, to August 26, 2008, to the Appeals Council.[4]

On July 5, 2006, Dr. Shirish Shahane, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), in which he found that Johnson could lift and/or carry items weighing up to 50 pounds occasionally and items weighing up to 25 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that she had an unlimited ability to push and/or pull. (R. at 186-91.) Dr. Shahane also found that Johnson could occasionally climb, balance, stoop, kneel, crouch and crawl, and he imposed no manipulative, visual or communicative limitations. (R. at 188-89.) Dr. Shahane found that Johnson should avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation and hazards. (R. at 189.)

Dr. Shahane noted that Johnson alleged disability due to rheumatic heart disease, high cholesterol, shortness of breath, sleep apnea, dizziness and chest and arm pain. (R. at 191.) Dr. Shahane also noted that the medical evidence established medically determinable impairments of rheumatic heart disease, mitral insufficiency with occasional premature ventricular contractions, ("PVC"), hiatal hernia, obstructive sleep apnea and cluster migraines. (R. at 191.) Dr. Shahane

---

[4] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

8

also noted that Johnson walked every morning as requested by her doctor and performed chores which usually cause fatigue and shortness of breath. (R. at 191.) He further reported that she occasionally cooked complete meals and explained that she was generally able to perform personal care, noting that she suffered from fatigue. (R. at 191.) In addition, Dr. Shahane indicated that Johnson performed activities such as sewing, driving, laundry, shopping, watching television, going out to eat, attending church and walking. (R. at 191.) Johnson indicated that she could walk approximately about one-half mile before needing to rest. (R. at 191.)

Based on the evidence of record, Dr. Shahane found Johnson's allegations to be partially credible. (R. at 191.) Dr. Shahane noted that recent cardiovascular testing did not show heart disease of disabling proportions, that there was no history of respiratory disease and a recent chest x-ray was negative. (R. at 191.) Dr. Shahane found no indication of a disabling impairment due to high cholesterol. (R. at 191.) Although Johnson had a history of obstructive sleep apnea, Dr. Shahane noted that this impairment, with the use of a continuous positive airway pressure, ("CPAP"), as prescribed, did not prevent Johnson from performing work activities. (R. at 191.)

On July 6, 2006, Richard J. Milan, Jr., Ph.D., completed a Psychiatric Review Technique form, ("PRTF"), in which he found that Johnson did not suffer from a severe impairment and that she had co-existing nonmental impairments that required referral to another medical specialty. (R. at 192-204.) Milan found that Johnson had a medically determinable impairment present that did not precisely satisfy the listed criteria, namely an anxiety disorder. (R. at 197.) Milan found that Johnson did not have any restriction of activities of daily living, no difficulties

9

in maintaining social functioning, persistence, concentration or pace and no episodes of decompensation were reported. (R. at 202.)

Milan noted that Johnson had no recent history of psychiatric hospitalizations or treatment from a mental health professional, indicating that she was only being prescribed medications from her treating physician. (R. at 204.) Additionally, he found that Johnson was able to engage in reasonable daily activities, and as such, her mental impairments were not severe. (R. at 204.) Milan found that, based on the evidence of record, Johnson's statements were partially credible. (R. at 204.)

Johnson presented to Dr. Samuel Vernon, M.D., at Smyth County Community Hospital several times from March 29, 2006, to September 6, 2006, with conditions and complaints including weight change, dyspnea, arthralgias, left shoulder pain secondary to bursitis, sore throat, chest congestion, appetite change, fatigue, weakness, abdominal pain and mitral regurgitation. (R. at 206-15.)

On January 9, 2007, Dr. Robert McGuffin, M.D., a state agency physician, completed a PRFC assessment in which he made findings identical to those noted in Dr. Shahane's July 5, 2006, PRFC, and relied on the same reasoning in finding Johnson's allegations to be only partially credible. (R. at 228-34.)

On January 17, 2007, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a PRTF in which he made findings identical to those noted in Milan's July 6, 2006, PRTF, and Tenison relied on the same reasoning in finding Johnson's allegations to be only partially credible. (R. at 235-47.)

10

From December 12, 2006, through June 12, 2007, Johnson again presented to Dr. Vernon due to high blood pressure, mitral regurgitation, low back pain, thoracic spine pain, nervousness, shakiness, mitral insufficiency, heart murmur, sinus tachycardia, occasional PVCs, glucose intolerance, upper respiratory infection, decreased energy, lethargy, palpitations and dyspnea. (R. at 248-66.)

On September 10, 2007, Dr. Vernon completed a Medical Assessment Of Ability To Do Work Related Activities (Physical) in which he found that Johnson could lift and/or carry items weighing up to 20 pounds occasionally and items weighing up to 10 pounds frequently; stand and/or walk for a total of one to two hours in an eight-hour workday, with one-third to one-half hours without interruption; sit for a total of six to seven hours in an eight-hour workday, with one-half to one hour without interruption; occasionally climb, kneel, crouch, crawl, balance and stoop; with no limitations on her ability to handle, feel, see, hear or speak, but with limitations on her ability to reach, push and pull. (R. at 267-68.) Dr. Vernon imposed environmental restrictions on temperature extremes and humidity. (R. at 268.) To support his findings, Dr. Vernon noted that Johnson was easily fatigued by activity, that heat and humidity increased her fatigue and that she had documented mitral valve regurgitation of a moderate degree, causing fatigue and reduced exercise tolerance. (R. at 267-68.)

On October 1, 2008, Johnson's counsel submitted additional records to the Appeals Council, which included Johnson's visits to Smyth County Community Hospital and Dr. Vernon dated January 24, 2008, to August 26, 2008. (R. at 273-86.)  During these visits, Johnson's complaints and conditions consisted of

11

dizziness, lightheadedness, mitral regurgitation, shakiness, nervousness, dyspnea, swelling in the ankles, legs and hands, as well as pains in her back that radiated from the collarbone.  (R. at 273-86.)

## II.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims.  *See* 20 C.F.R. § 404.1520 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* C.F.R. § 404.1520 (2009).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step.  *See* C.F.R. § 404.1520(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. § 423(d)(2)(A), (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 15, 2008, the ALJ denied Johnson's claim. (R. at 17-23.) The ALJ found that Johnson met the disability insured status requirements of the Act for disability purposes through December 31, 2011. (R. at 19.) The ALJ determined that Johnson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.) The ALJ also found that Johnson suffered from severe impairments, namely mitral valve insufficiency with sinus tachycardia. (R. at 19.) However, the ALJ determined that Johnson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ also found that Johnson possessed the residual functional capacity to perform a range of light exertional work[5] that allowed her to lift or carry items weighing up to 10 pounds frequently and items weighing up to 20 pounds occasionally. (R. at 20). The ALJ found that Johnson was able to stand or walk for six hours out of an eight-hour workday and for one mile at a time and sit for six hours out of an eight-hour workday, but she could not be exposed to fumes and could not work around hazards or hazardous machinery. (R. at 20.) In addition, the ALJ found that Johnson could occasionally climb, balance, stoop, kneel, crouch and crawl, but that she must avoid repetitive lifting, bending and carrying. (R. at 20.) The ALJ determined that Johnson was capable of performing her past relevant work as a general office clerk, as this work did not require the performance of work-related activities precluded by her residual functional capacity. (R. at 23.) Therefore, the ALJ found that Johnson was not under a "disability" as defined under the Act and was not entitled to benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(f).

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2009).

Johnson argues that the ALJ erred by failing to accord proper weight to the opinion of Johnson's treating physician, Dr. Vernon.  (Brief In Support Of Motion Plaintiff's For Summary Judgment, ("Plaintiff's Brief"), at 5-9.)  Johnson also argues that, based upon the vocational expert's testimony, a finding of disabled was justified.  (Plaintiff's Brief at 8-9.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence.  *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979).  While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the

factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

At the outset, I must note that Johnson cites several medical records that pre-date February 28, 2006, the alleged onset date of disability. (Plaintiff's Brief at 5-6.) The undersigned further notes that only records within the relevant time period will be considered, i.e. medical records from the alleged onset of disability until the date Johnson was last insured for DIB purposes.

Johnson first argues that the ALJ erred by failing to accord proper weight to the opinion of her treating physician, Dr. Vernon. (Plaintiff's Brief at 5-9.) The ALJ stated in his opinion that he "considered but g[a]ve[] little weight to the Medical Source Statement of Ability to do Work-Related Activities (Physical) completed by Samuel Vernon, M.D." (R. at 22.) The ALJ explained that he "ordinarily" placed "significant reliance" on the opinion of a claimant's treating physician; however, he then stated that "a checklist/form of residual functional capacity is in itself entitled to little weight when not accompanied by medical examinations or reports of clinical findings supporting the opinion[.]" (R. at 22.)

It is well-settled that an ALJ has a duty to consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. In general, the ALJ must give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2) (2009). However, "circuit precedent does not require that a

15

treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[6]  In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, the record does not contain a great deal of medical evidence from the relevant time period.  However, the record does contain medical opinions from multiple state agency sources, as well as treatment notes and opinions of Dr. Vernon, Johnson's treating physician.   On July 5, 2006, Dr. Shahane, a state agency physician, completed a PRFC and determined that Johnson could lift and/or carry items weighing up to 50 pounds occasionally and items weighing up to 25 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that she had an unlimited ability to push and/or pull.  (R. at 187.)  Dr. Shahane also found that Johnson could occasionally climb, balance, stoop, kneel, crouch and crawl, and he imposed no manipulative, visual or communicative limitations.  (R. at 188-89.)   Dr. Shahane did impose environmental limitations, noting that Johnson should avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation and hazards.  (R. at 189.)

Based on the evidence of record, Dr. Shahane found Johnson's allegations to

---

[6] *Hunter* was superseded by 20 C.F.R. § 404.1527(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

16

be partially credible.  (R. at 191.)  Dr. Shahane noted that recent cardiovascular testing did not show heart disease of disabling proportions, that there was no history of respiratory disease and a recent chest x-ray revealed negative results. (R. at 191.)  Dr. Shahane found no indication of a disabling impairment due to high cholesterol.  (R. at 191.)  Although Johnson had a history of obstructive sleep apnea, Dr. Shahane noted that this impairment, with the use of a CPAP machine, as prescribed, did not prevent Johnson from performing work activities.  (R. at 191.) On January 9, 2007, Dr. McGuffin, another state agency physician, completed a PRFC assessment in which he made findings identical to those noted in Dr. Shahane's July 2006 PRFC.  (R. at 228-33.)

On July 6, 2006, Milan, a state agency psychologist, completed a PRTF, in which he found that Johnson did not suffer from a severe impairment and that she had co-existing nonmental impairments that required referral to another medical specialty.  (R. at 192.)  Milan found that Johnson had a medically determinable impairment present that did not precisely satisfy the listed criteria, namely an anxiety disorder.  (R. at 197.)  Milan noted no restriction as to Johnson's activities of daily living, no difficulties in maintaining social functioning, persistence, concentration or pace and no episodes of decompensation were reported.  (R. at 202.)

Milan further reported that Johnson had no recent history of psychiatric hospitalizations or treatment from a mental health professional, noting that she was being prescribed medications only by her treating physician.  (R. at 204.) Additionally, he found that Johnson was able to engage in reasonable daily activities, and, as such, her mental impairments were not severe.  (R. at 204.)

Case 2:08-cv-00071-GMW-PMS   Document 13   Filed 08/25/09   Page 17 of 21   Pageid#: 61

Milan found that, based on the evidence of record, Johnson's statements were partially credible. (R. at 204.) On January 17, 2007, Tenison, another state agency psychologist, completed a PRTF in which he made findings identical to those rendered by Milan. (R. at 247.)

Johnson presented to Dr. Vernon several times from March 29, 2006, to September 6, 2006, with conditions and complaints including weight change, dyspnea, arthralgias, left shoulder pain secondary to bursitis, sore throat, chest congestion, appetite change, fatigue, weakness, abdominal pain and mitral regurgitation. (R. at 206-15.) From December 12, 2006, through June 12, 2007, Johnson again presented to Dr. Vernon due to high blood pressure, mitral regurgitation, low back pain, thoracic spine pain, nervousness, shakiness, mitral insufficiency, heart murmur, sinus tachycardia, occasional PVCs, glucose intolerance, upper respiratory infection, decreased energy, lethargy, palpitations and dyspnea. (R. at 248-66.)

On September 10, 2007, Dr. Vernon completed a Medical Assessment Of Ability To Do Work Related Activities (Physical) in which he found that Johnson could lift and/or carry items weighing up to 20 pounds occasionally and items weighing up to 10 pounds frequently; stand and/or walk for a total of one to two hours in an eight-hour workday, one-third to one-half an hour without interruption; sit for a total of six to seven hours in an eight-hour workday, one-half to one hour without interruption; occasionally climb, kneel, crouch, crawl, balance and stoop; with no limitations on her ability to handle, feel, see, hear, or speak, but with limitations on her ability to reach, push and pull. (R. at 267-68.) Dr. Vernon imposed environmental restrictions as to Johnson's exposure to temperature

extremes and humidity. (R. at 268.) To support his findings, Dr. Vernon noted that Johnson was easily fatigued by activity, that heat and humidity increased her fatigue and that she had documented mitral valve regurgitation of a moderate degree, causing fatigue and reduced exercise tolerance. (R. at 267-68.)

On October 1, 2008, Johnson's counsel submitted additional records to the Appeals Council, which included Johnson's visits to Smyth County Community Hospital and Dr. Vernon dated January 24, 2008, to August 26, 2008. (R. at 273-86.) During these visits, Johnson's complaints and conditions consisted of dizziness, lightheadedness, mitral regurgitation, shakiness, nervousness, swelling in the ankles, legs and hands, dyspnea and pains in her back that radiated from the collarbone. (R. at 273-86.)

After a review of the relevant medical evidence, I agree with the ALJ's assessment that Dr. Vernon's findings are not supported by objective medical evidence. The record is devoid of any objective medical findings by Dr. Vernon revealing any disabling impairments. The vast majority of Dr. Vernon's treatment notes consist merely of the listing of impairments, or checklists of ailments, that were based solely on Johnson's subjective complaints. In fact, Dr. Vernon's Medical Assessment Of Ability To Do Work Related Activities (Physical) indicates that Dr. Vernon's medical findings were based on "history given by Mrs. Johnson." (R. at 267-68.) Furthermore, as pointed out by the ALJ, Dr. Vernon's treatment was very conservative, as Johnson was not hospitalized for any impairment, and Dr. Vernon had not placed any physical restrictions on her, but, instead, he advised her to walk everyday to help alleviate the pain caused by her symptoms. Notably, the ALJ's decision to reject Dr. Vernon's findings is

supported by Johnson's Disability Report – Adult form, which reflects that Johnson ceased worked in February 2006 because she was offered an early retirement package. (R. at 57.) Although Johnson claims that her health problems caused her to quit work, it appears, by Johnson's own admission, that the critical motivating factor in choosing to stop working was the fact that her company offered an early retirement package. (R. at 57.)

In addition to the fact that Dr. Vernon's medical findings are not well-supported by medically acceptable clinical and laboratory diagnostic techniques, the record contains the opinion of four state agency opinions who all determined that Johnson's conditions are neither disabling nor severe. Accordingly, because Dr. Vernon's medical findings were inconsistent with other substantial evidence of record, and because his findings were based upon Johnson's subjection allegations and not objective medical testing, the undersigned is of the opinion that the ALJ was justified in rejecting the opinions and findings of Dr. Vernon.

Johnson also argues that, had the ALJ accorded controlling weight to the findings made by Dr. Vernon, a finding of disabled would have been justified based upon the vocational expert's testimony. (Plaintiff's Brief at 8-9.) This argument is without merit. The court recognizes that the vocational expert opined that, based upon Dr. Vernon's findings, Johnson could not perform her past relevant work. (R. at 116.) However, as discussed above, the ALJ was justified in according little weight to the opinion of Dr. Vernon, as Dr. Vernon's findings are inconsistent with other substantial evidence of record and are unsupported by objective clinical findings and testing. Thus, any testimony by the vocational expert based on Dr. Vernon's opinion also was given little weight.

*IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment, deny Johnson's motion for summary judgment and affirm the decision of the Commissioner denying benefits.

An appropriate order will be entered.

**ENTER:** This 25th day of August 2009.

*/s/ Glen M. Williams*_____
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:08-cv-00071-GMW-PMS   Document 13   Filed 08/25/09   Page 21 of 21   Pageid#: 65